* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, defendant-employer regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff on or about July 24, 2003, the date the alleged occupational disease was diagnosed.
3. The carrier on the risk is Liberty Mutual Group.
4. Plaintiff received sickness and accident benefits pursuant to 100% defendant-employer funded disability plan.
5. Plaintiff's average weekly wage was sufficient to generate the maximum weekly compensation rate for 2003 of $674.00 per week.
6. A videotape of plaintiff's job was admitted into evidence at the Deputy Commissioner's hearing.
7. Plaintiff lost no time from work as a result of his alleged occupational disease, and has continued working in a full time capacity as a first stage tire builder since July 24, 2003, the date of his alleged occupational disease.
8. At and subsequent to the Deputy Commissioner's hearing, the parties submitted the following:
 a. A packet of medical records, which was admitted into the record and marked as Stipulated Exhibit (2);
 b. A packet of Industrial Commission Forms that includes a Form 33R, which was admitted into the record and marked as Stipulated Exhibit (3);
 c. Plaintiff's employment file, which was admitted into the record and marked as Stipulated Exhibit (4), and;
 d. An incident file, which was admitted into the record and marked as Stipulated Exhibit (5).
9. The issues before the Full Commission are whether plaintiff's Dupuytren's condition is a compensable occupational disease and, if so, to what benefits plaintiff is entitled.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following
 FINDINGS OF FACT
1. As of the date of the Deputy Commissioner's hearing, plaintiff was 45 years of age, with his date of birth being January 14, 1959. Plaintiff is right hand dominant and has been employed as a first stage tire builder for defendant-employer since May 15, 1978. Plaintiff has bilateral Dupuytren's contractures, greater on his right hand as opposed to the left.
2. Plaintiff works six days per week as a first stage tire builder, building approximately 150 tires per shift. It usually takes plaintiff two minutes to build a first stage tire, but the process can last two and one-half to three minutes.
3. Plaintiff's duties require the almost constant use of his hands during production, which includes turning the tire, using scissors to cut "set-up" material, running stock within the plant, and using a knife. The first stage truck tire builder must cut and re-cut the rubber three to four times per tire. The knife used is approximately twelve inches long and has a wooden handle. The knife has a round part with a hook in the middle of the blade, which allows the tire builder to hook the rubber and then slice it. Plaintiff testified that while using the knife, the handle presses against the middle, ring and small fingers of his right hand. The scissors used by plaintiff are griped with his right hand every minute and a half to every two minutes throughout a shift. Plaintiff testified that the cutting required in his job creates pressure in the palms of his hands that extends towards his little and ring fingers, which is where his Dupuytren's contractures have appeared. The other tool used by plaintiff is a hand stitcher that has blue plastic handles and a big roller. Plaintiff used the hand stitcher for approximately four to five years and it was subsequent to the introduction of this tool that he first noticed the Dupuytren's contractures.
4. Plaintiff first sought medical attention from Dr. Douglas McFarlane, a board certified orthopaedic surgeon, on July 22, 2003. At that time, plaintiff reported a constant sharp pain, with throbbing and stabbing sensations in his hands. Plaintiff also reported weakness in his hands and that his condition was getting progressively worse. Following his examination, Dr. McFarlane diagnosed plaintiff as having Dupuytren's nodules, which is a condition that is not infrequently associated with a similar sort of thickening in the sole of the foot, primarily in the arch area. Accordingly, Dr. McFarlane also examined plaintiff's feet and found that plaintiff did have a thickening in the arch of both feet, which is also referred to as plantar fibromatosis. At that time, plaintiff was not experiencing flexor contractures and was able to extend and flex his left hand and fingers without any difficulty. With his right hand, plaintiff demonstrated the inability to fully extend by approximately 5 to 10 degrees on both his small and ring fingers. For plaintiff's hand condition, Dr. McFarlane recommended surgery and anticipated that plaintiff would be able to return to work as a tire builder with no restrictions. As of the Deputy Commissioner's hearing, plaintiff had declined this surgery.
5. By correspondence dated March 12, 2004, Dr. McFarlane responded to Mr. Darrel Reddy, senior case manager with Liberty Mutual, regarding causation. In this correspondence, Dr. McFarlane noted that the precise cause of Dupuytren's contractures was unknown, but that there was a genetic component given its more common appearance in northern Europeans. Dr. McFarlane also noted that Dupuytren's contractures were common in patients who have experienced repetitive micro-traumas to their hands and that persons performing heavy or repetitive work with their hands were at risk for developing this condition. Dr. McFarlane defined repetitive micro-traumas as any activity involving either a vibrating type action or the use of the hands to grip firmly on a repetitive basis that causes bruising of the tissues. Dr. McFarlane defined repetitive gripping as anyone who grips in excess of 10 to 15 times per hour.
6. At his deposition, Dr. McFarlane testified that while there may be a genetic tendency for the development of Dupuytren's contractures, a triggering event is required. Dr. McFarlane stated that plaintiff's work as a first stage tire builder for defendant-employer was an adequate trigger for the development of or significant aggravation of his Dupuytren's contractures. Dr. McFarlane felt that plaintiff's work with defendant-employer placed him at an increased risk for the development of Dupuytren's contractures than members of the general public not so employed. Dr. McFarlane based his opinions in part on his treatment of multiple tire builders who worked for defendant-employer who developed Dupuytren's contractures. Additionally, when he practiced medicine in Scotland, Dr. McFarlane treated many manual workers who experienced Dupuytren's contractures.
7. On October 27, 2003, plaintiff's was examined by Dr. Peter G. Dalldorf, a board certified orthopaedic surgeon. Plaintiff reported to Dr. Dalldorf that he continued to work as a tire builder for defendant-employer, but that he experienced problems with daily activities and his work duties due to the contractures. Plaintiff also reported that he experienced constant severe pain when he used his hands, and that his condition made it difficult for him to sleep. Dr. Dalldorf's examination revealed some contractures of plaintiff's hands with some palpable cords in his palms, more so on the right hand. Palpable cords are the diseased tissues that can be felt in the palm, and which grow to eventually drawing the fingers downwards. Plaintiff also displayed contractures about his right ring finger with a 20-degree contracture at the MCP joint, the joint at the base of the finger. Plaintiff's right middle finger had approximately a 10-degree contracture and his right small finger had a 40-degree contracture. On his left hand, plaintiff had a 10-degree contracture on his small finger with palpable cords in his palm. Ultimately, Dr. Dalldorf also diagnosed plaintiff as having Dupuytren's contractures of both hands, but he did not examine plaintiff's feet.
8. Dr. Dalldorf testified that it was generally understood and accepted in the medical community that the development of Dupuytren's contractures is caused by a combination of inherited factors and environmental factors, such as repetitive trauma to the hands. After viewing the videotape of plaintiff performing his job, Dr. Dalldorf stated to a reasonable degree of medical certainty that plaintiff's work as a tire builder placed him at an increased risk of contracting Dupuytren's contractures. Additionally, Dr. Dalldorf testified that plaintiff's work was a significant contributing factor in the development of his Dupuytren's contractures. Dr. Dalldorf also testified regarding studies that he contends demonstrates that Dupuytren's contractures are more common in people that have heavy labor jobs.
9. Dr. George Edwards, a board certified orthopaedic surgeon and certified hand specialist, was also consulted regarding the cause of plaintiff's condition. Dr. Edwards never examined plaintiff, and initially rendered his opinions based upon a review of plaintiff's medical records and a videotape of someone other than plaintiff performing the first stage tire builder job. Based upon that information, Dr. Edwards opined that there was no evidence that plaintiff's job contributed to or caused the development of his Dupuytren's contractures. In part, Dr. Edwards based his opinion on the fact that plaintiff had corresponding problems with his feet, a sign he interpreted as being indicative of a more aggressive and severe form of Dupuytren's. At his deposition, Dr. Edwards was shown the videotape of plaintiff performing his job as a first stage tire builder, and his opinions remained the same.
10. Based upon the totality of the credible medical evidence of record, the Full Commission gives greater weight to the opinions expressed by Dr. McFarlane and Dr. Dalldorf, than those of Dr. Edwards, despite his status as a certified hand specialist. Dr. Edwards never examined or treated plaintiff, as opposed to Dr. Dalldorf and particularly Dr. McFarlane.
11. The greater weight of the medical evidence shows that plaintiff's employment with defendant-employer caused or significantly contributed to the development of his Dupuytren's contractures. Additionally, plaintiff's employment with defendant-employer exposed him to an increased risk of developing this condition as compared to members of the general public not so employed.
12. As of the close of the record before the Deputy Commissioner, plaintiff continued to work in his regular job with defendant-employer. Dr. McFarlane recommended that plaintiff undergo surgery, one hand at a time, approximately six weeks apart. Following these procedures, Dr. McFarlane stated that plaintiff should be able to return to his regular job with defendant-employer.
13. The treatment provided by Dr. McFarlane and Dr. Dalldorf was reasonably necessary to effect a cure, provide relief or lessen plaintiff's period of disability.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v.Motor Panels, Inc., 136 N.C. App. 351, 524 S.E.2d 368, disc.rev. denied, 351 N.C. 473, 543 S.E.2d 488 (2000).
2. In this case, plaintiff presented competent medical testimony that his employment with defendant-employer caused or significantly contributed to the development of his Dupuytren's contractures. N.C. Gen. Stat. § 97-53(13). Additionally, plaintiff's employment with defendant-employer exposed him an increased risk of developing this condition as compared to members of the general public not so employed. Id.
3. As the result of his occupational disease, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred as a result of his Depuytren's contractures, including the expenses associated with treatment provided by Dr. McFarlane and Dr. Dalldorf, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability. Dr. Peter Dalldorf is approved and designated as plaintiff's primary treating physician. N.C. Gen. Stat. §§ 97-19; 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of his occupational disease, including the expenses associated with treatment provided by Dr. McFarlane and Dr. Dalldorf, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability. Dr. Peter Dalldorf is approved and designated as plaintiff's primary treating physician.
2. Based upon her work in this matter, counsel for plaintiff would be entitled to a reasonable attorney's fee of 25% of any indemnity compensation paid to plaintiff.
3. The issue of any temporary total disability to which plaintiff may be entitled if he undergoes surgery is reserved for future determination.
4. Defendants shall pay the costs.
This 1st day of March 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN